# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

WS PACKAGING GROUP, INC.,

        Plaintiff,

     v.                                     Case No. 06-C-674

GLOBAL COMMERCE GROUP, L.L.C.,

        Defendant.

## ORDER DENYING MOTION TO DISMISS

Plaintiff WS Packaging Group, Inc. ("WS") brought this action for declaratory relief against Defendant Global Commerce Group, LLC ("Global") seeking a determination that WS is not infringing on Global's patent for internet game pieces, U.S. Patent No. 6,406,062 ("the '062 patent"). The case is presently before the court on Global's motion to dismiss on the ground that there is no case or controversy sufficient to warrant this court's exercise of jurisdiction.[1] For the reasons set forth below, Global's motion will be denied.

### FACTUAL BACKGROUND

Both WS and Global create and sell Internet game pieces. The game pieces are used in advertising programs and sales promotions for other companies. Global, a limited liability company

---

[1]Global's motion to dismiss also lists lack of personal jurisdiction and improper venue as grounds for dismissal. However, Global fails to develop any argument in support of these alternative grounds in its brief. I therefore conclude that Global has waived its claims that the court lacks personal jurisdiction over it or that venue in this court is improper. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 (7th Cir. 2005) (failure to develop arguments constitutes waiver).

located in Georgia, claims that it has run internet game promotions for such companies as Ford Motor Company, Visa International, Intel, Frito-Lay and ESPN Productions. Global's Internet-related programs and promotions involve the distribution of "WebDecoder" and "NetDecoder" game pieces, and Global claims to have several U.S. Patents and federal and Georgia trademark registrations covering its intellectual property. These Internet game pieces, when held up to a computer screen showing a particular web site, reveal a message hidden either in the product itself (WebDecoder) or on the screen (NetDecoder).

WS is a Wisconsin corporation that manufactures Internet-related promotional hidden message game pieces at its plant in Algoma, Wisconsin. (Aff. of William Challoner, ¶1.) Beginning in 2000, WS entered into a series of licensing agreements with Global concerning, among other things, the '062 patent. (*Id.* at ¶ 3.) Although WS denies that its hidden message game pieces infringe on the '062 patent, WS claims it nevertheless entered into the licensing agreement with Global because it found the exclusivity of the license advantageous to its business. (*Id.* at ¶ 7.) During the term of the licensing agreement, WS claims that Global principal Donnie Causey, one of the three individuals to whom the '062 patent was issued, repeatedly stated that WS's hidden message products were covered by the '62 patent and that, if WS failed to renew the licensing agreement, Global would sue WS and its customers for patent infringement. (*Id.* at ¶ 7.) According to WS, Causey and other Global representatives also revealed Global's patent litigation philosophy to WS. WS claims that Causey explained that Global would routinely go out looking for hidden message game pieces in the marketplace that were not manufactured under its license. Upon discovery of such pieces, Global would send out a letter to the company running the promotion, demanding that it either stop the promotion or obtain a license. Global would then be

2

contacted by the supplier of the game pieces, and Global would then file an infringement action against both the supplier and the company running the promotion. According to WS, Causey explained that the purpose of suing the suppliers' customers was to hurt the supplier's business and scare away its customers. (*Id.* at ¶ 3.)

In August of 2004, a dispute arose between WS and Global over the licensing agreement. Separate lawsuits between the parties were filed in both Georgia and Wisconsin. The litigation was settled in December of 2005, and all licensing agreements and business relationships between the parties were terminated at that time. (*Id.* at ¶ 8.) Notwithstanding the termination of its licensing agreement with Global, WS continued to manufacture the same hidden message game pieces that Global previously claimed infringed the '062 patent. (*Id.* at ¶ 9.)

On May 19, 2006, Global's General Counsel e-mailed the attorney who represented WS in the state court litigation over the licensing agreement "in the hope to defuse a potentially explosive situation." (Def.'s Br. In Supp., Ex. 1.) According to the e-mail, it had come to Global's attention that WS "is either printing or about to print a NetDecoder project of approximately 10,000,000 pieces." (*Id.*) Global's attorney warned that "Unless this project was brought to WS by e-prize there is no right or license to produce or use the NetDecoder patent (062)." (*Id.*) The attorney went on to assure WS that its belief that the technology was covered by another patent was incorrect and that "Global takes this kind of infringement very seriously!" (*Id.*) In closing, Global's attorney stated: "I strongly suggest that you let me know what is going on with your client on this issue ASAP, before WS spends money on printing a project that infringes our intellectual property." (*Id.*)

WS's attorney in the previous action sent a very brief reply e-mail, in which he thanked Global's counsel for the note and indicated he would look into the matter. (*Id.*) On June 8, 2006,

3

WS brought this action seeking a declaratory judgment that WS has not infringed Global's '062 patent. (Pl.'s Compl. at 4.)

## ANALYSIS

It is important to note at the outset that the case is before me on a motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12. In deciding a motion to dismiss, the court must accept as true all factual allegations in the complaint. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002); *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 401 (7th Cir. 1996). When, as here, matters outside the pleadings are considered, the motion is treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(c). Under Rule 56 as well, however, the facts are viewed in the light most favorable to the non-moving party. *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 954 (Fed. Cir. 1987) ("All significant doubt over pertinent factual issues must be resolved in favor of the non-moving party."). In other words, a motion to dismiss or for summary judgment is not the proper vehicle to resolve factual disputes that may ultimately determine the outcome of the case.

The Declaratory Judgment Act, in accordance with Article III of the Constitution, requires the existence of an actual controversy between the parties before a federal court can constitutionally assume jurisdiction. *See* 28 U.S.C. § 2201(a). The purpose of the declaratory judgment act is to allow a party "who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir. 1993). In *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731 (Fed. Cir. 1988), the Federal Circuit described the importance of declaratory relief in the area of patent law. Prior to the enactment of the

4

Declaratory Judgment Act, the competitor of a patent owner claiming infringement operated under a constant threat to his business until and unless the patent owner elected to file suit. As the *Arrowhead* Court explained:

> competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests. The sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual controversy required by the Act.

846 F.2d at 735; *see also Cardinal Chemical Co. v. Morton Int'l Inc.*, 508 U.S. 83 (1993). Still, there must be an actual controversy; "more is needed than knowledge of or notice of an adversely held patent." *Capo, Inc. v. Dioptics Medical Products, Inc.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004).

The Federal Circuit has articulated a two-part test for determining whether an actual controversy exists in declaratory judgment actions involving patents. First, the defendant's conduct must have created in the plaintiff an objectively "reasonable apprehension that the defendant will initiate suit if the plaintiff continues the allegedly infringing activity," and second, the plaintiff must have either actually produced the device or have prepared to produce it. *Arrowhead*, 846 F.2d at 736 (*citing Goodyear Tire*, 824 F.2d at 955). Later in *Arrowhead*, the Federal Circuit gave an alternative phrasing to this test, noting that it basically requires "two core elements: (1) acts of defendant indicating an intent to enforce its patent; and (2) acts of plaintiff that might subject it or its customers to suit for patent infringement." *Id.* at 737. Where a patent owner expressly charges a competitor with infringement, the first element is clearly met. But an express charge of infringement is not essential. Given the subtleties in language used by lawyers, the courts have not

required an express infringement charge. *Id.* at 736. However, "when the defendant's conduct, including its statements, falls short of an express charge, one must consider the 'totality of the circumstances' in determining whether that conduct meets the first prong of the test." *Id.* at 736 (quoting *Goodyear Tire*, 824 F.2d at 955). "If, on the other hand, defendant has done nothing but obtain a patent, there can be no basis for the required apprehension, a rule that protects quiescent patent owners against unwarranted litigation." *Id.*

Viewing the evidence most favorably to WS, I conclude that the *Arrowhead* test is met. WS has offered evidence that Donnie Causey repeatedly stated directly to William Challoner that the hidden message product WS was manufacturing under the license agreement infringed on the '062 patent. (Challoner Aff. ¶ 7.) Given that Causey was one of the individuals to whom the '062 patent was issued and a principal of Global, it is not surprising that WS took his statements seriously. And since WS is producing or intends to produce the same game pieces that it manufactured under the license agreement (*id.* at ¶ 9), it has a reasonable basis for believing that it will be sued by Global for doing so. While these are the principal facts supporting WS's claim that a genuine controversy exists, other evidence provides additional support for finding that WS has an objectively reasonable apprehension of litigation.

First, the parties have an adverse legal history, including recently settled suits in Georgia and Wisconsin dealing with the very same patent and technology.[2] *See, e.g., Goodyear Tire*, 824 F.2d

---

[2] Global attempts to diminish the impact of those state court actions on the analysis here by noting that they centered on contractual disputes over the '062 license agreement, rather than on infringement or invalidity of the patent *per se*. In this context, that is a distinction without a difference. WS has alleged, and Global has not disputed, that the subject matter of those suits involved the '062 patent, specifically, Global's alleged violation of the exclusive license agreement and contracts related thereto. *See, e.g., Goodyear Tire*, 824 F.2d at 955 (regarding as immaterial the fact that state court action between the parties did not specifically involve the patents at issue

at 955 (finding relevant the parties' "clear history of adverse legal interests" in actions involving the same technology). Second, Global made known its intent to enforce its patents in a 2003 article in *Promo*, a trade magazine, in which its managing director, Matt Montesi, another of the patent-holders, described with apparent pride Global's habit of suing the end user as a means to pressure an allegedly infringing vendor/producer (presumably to pressure the party either to cease and desist or to come to the bargaining table and negotiate a license). (Challoner Aff., Attach. 1.) In Global's reply brief, Montesi characterizes those comments as a misstatement, but, of course, his retraction has no bearing on the comments' *past* effect on WS's apprehension of litigation. Third, the e-mail from Global's counsel to WS revealed Global's "intent to enforce its patent," to borrow the phrasing of the *Arrowhead* court. *Arrowhead*, 846 F.2d at 737. The e-mail makes clear that if WS is printing, or about to print, a project involving the '062 technology (products that "reveal[] an electronically generated hidden image"), Global will consider such activity "an infringement of our 062 patent." (Br. In Supp., Ex. 1.) In the e-mail, Smith also states, "Global takes this type of infringement very seriously!" (*Id.*)

Global's arguments against the reasonableness of WS's apprehension are either inapposite or otherwise unconvincing in light of the relevant standard. The reasonableness of plaintiff's apprehension is measured objectively from the alleged infringer's perspective, not the patentee's; the inquiry focuses on whether a reasonable person in plaintiff's circumstances would have feared litigation. *See Arrowhead*, 846 F.2d at 736; *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975,

---

in the declaratory judgment action, and finding the state court action relevant to the "actual controversy" inquiry in light of the fact that both actions involved the same technology). Furthermore, while "[r]elated litigation may be evidence of a reasonable apprehension, . . . such evidence is not required." *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed. Cir. 1992).

7

979 (Fed. Cir. 1993) ("It is the objective words and actions of the patentee that are controlling."). Global argues that the e-mail sent by Smith, if it did contain a threat, carried no express threat, and furthermore that it was sent by an agent unauthorized to threaten patent litigation on Global's behalf. Global also argues that WS knew as much, based upon the parties' prior dealings. However, it was reasonable for WS to view the implied threat in Smith's e-mail as authorized, especially in light of basic agency principles and in light of the fact that Smith had been Global's counsel in the recent state court actions. Furthermore, the reasonableness of a party's fear of litigation does not require an authorized threat of litigation. *Goodyear Tire*, 824 F.2d at 956. Similarly, under the law of the Federal Circuit, a party need not wait for an express threat, for "[s]uch a requirement would utterly defeat the purpose of the Declaratory Judgment Act." *Id.* Indeed, the Act was largely motived by Congress's desire to prevent patent owners from suppressing competition by threatening infringement without ever actually bringing a suit that would put their patents to the test. *Arrowhead*, 846 F.2d at 734-35.

Global also argues it was unaware whether WS was in fact producing, or planning to produce, game pieces that might infringe the '062 patent, and that any threat in the e-mail could therefore only be conditional in nature. But again, these arguments miss the mark. WS has admitted that it is producing the same game pieces that Causey previously claimed infringed Global's patent. (Challoner Aff. ¶ 9). In its brief in opposition to Global's motion, WS confirms what Global claims it previously only suspected: "WS was engaged in the very activity the Demand claimed was infringing – and was producing the very same products Global had threatened with an infringement suit only three years earlier." (Br. In Opp. at 2.) Moreover, Global's knowledge of WS's production or production plans is not at issue, and WS need not wait for an unconditional

8

threat before its apprehension can be deemed reasonable. Similarly irrelevant is Global's claim that in its past dealings with other parties it has never threatened an infringement suit prior to bringing one. The reasonableness of WS's apprehension of litigation does not turn on its knowledge of Global's *modus operandi* when bringing suit against alleged infringers, and WS clearly has no duty to investigate the matter. Global also argues that it lacked a present intention to bring suit, but this, too, is irrelevant. *Vanguard Research, Inc. v. Peat, Inc.*, 304 F.3d 1249, 1255 (Fed. Cir. 2002) ("A patentee's present intentions do not control whether a case or controversy exists."). Finally, Global points to the e-mail response given by Kelly, WS's counsel, to Smith—"Thanks. I'm looking into it"—and argues that it betrays no apprehension of litigation. However, the fact that Kelly did not then communicate any apprehension to Smith has little, if any, bearing on the reasonableness of WS's apprehension of litigation from Global at the time it brought the current action. WS was under no duty to communicate to Global whatever apprehension it might have felt, and WS very likely had sound business reasons for not doing so.

The second prong of the two-part test for an actual controversy requires that the plaintiff be producing the allegedly infringing device, or making preparations to produce it. That prong is easily satisfied here, as WS has freely admitted to producing the hidden game pieces that purportedly infringe the '062 patent.

Global urges this court to refrain from exercising the discretion granted it under the Declaratory Judgment Act to hear this case. Global argues that, in keeping with the Act's purposes, the parties should be encouraged to settle the dispute prior to initiating litigation. Global also suggests that WS filed this action in order to strengthen its negotiating position. I am not persuaded by Global's arguments here, especially in light of the fact that WS has expressed no interest in

9

settling with Global, and in fact seems hostile to the idea. The divisive nature of the recent litigation over the '062 license, as well as the termination of that license agreement, amply buttress WS's claim that it would rather "clear the air" through a declaratory judgment of non-infringement than pursue a settlement agreement. Indeed, the Declaratory Judgment Act was passed to address patent cases just such as this one, where, in the absence of a declaratory judgment, the plaintiff faces the possibility of mounting liability and the desertion of its customers.

For the above reasons, **IT IS ORDERED** that defendant's motion to dismiss (Docket #5) be hereby **DENIED.** The clerk shall set this matter on the court's calendar for a Rule 16 scheduling conference.

Dated this _____5th_____ day of September, 2006.

_____s/ William C. Griesbach_____
William C. Griesbach
United States District Judge

10